1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6
7

CENTER FOR FOOD SAFETY, et al.,

Case No. 23-cv-02714-SI

8

Plaintiffs,

9

v.

**ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT, MOTION TO STRIKE EXTRA-RECORD EVIDENCE, AND MOTION TO SEAL PORTIONS OF ADMINISTRATIVE RECORD**

10

ENVIRONMENTAL PROTECTION AGENCY, et al.,

11
12

Defendants,

Re: Dkt. Nos. 61, 68, 69, 77, 86

13

and

14

CROPLIFE AMERICA, et al.,

15

Intervenor Defendants.

16      The parties in this case dispute the appropriate level of regulatory oversight for seeds treated

17  with neonicotinoid pesticides.  Under the Federal Insecticide, Fungicide, and Rodenticide Act

18  ("FIFRA"),[1] the Environmental Protection Agency ("EPA") requires that neonicotinoid pesticides

19  be registered.  The registration process calls for the EPA to collect data and analyze whether the

20  benefits of the pesticide exceed any costs to the environment or human health.  While neonicotinoid

21  pesticides can be sprayed over crop fields, by far the most common way these pesticides are used is

22  to coat seeds before they are distributed and planted.

23      The parties agree that, once treated, the seeds themselves become "pesticides" under the

24  FIFRA definition.  But the EPA currently exempts treated seeds from going through a separate

25  registration process, reasoning that the registration for the treating pesticides provides sufficient data

26  about the overall impact of the pesticides, including through their application to treated seeds.

27
28      _____

[1] FIFRA is codified at 7 U.S.C. § 136 et seq.

Plaintiffs, a pair of environmental advocacy organizations, believe the existing layer of review is inadequate. They argue that treated seeds cannot be exempted under the language of the statute and EPA's regulations. Plaintiffs want the treated seeds to be subject to FIFRA registration, which would force specific study and cost-benefit analysis of seeds treated with neonicotinoid pesticides. Plaintiffs presented these requests to the EPA via petition in 2017, which the EPA denied in 2022. Plaintiffs now make two claims to this Court: first, that the EPA's petition denial was arbitrary and capricious; second, that the EPA exceeds its statutory authority when it exempts neonicotinoid treated seeds from going through their own registration process.

In this order, the Court considers the parties' cross motions for summary judgment. As explained below, the Court GRANTS the defendant EPA's motion for summary judgment on plaintiffs' first claim and DISMISSES plaintiffs' second claim for lack of subject matter jurisdiction.

## BACKGROUND

### I.    Statutory and Regulatory Framework

Congress first enacted FIFRA in 1947 as primarily "a licensing and labeling statute." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 990-91 (1984). Twenty-five years later, Congress "transformed FIFRA from a labeling law into a comprehensive regulatory statute" due to "mounting public concern about the safety of pesticides and their effect on the environment." *Id.* at 991. Since 1970, the EPA has been responsible for implementing these regulations. *Id.*

FIFRA prohibits the distribution or sale of pesticides[2] unless they are registered, with certain exceptions. 7 U.S.C. § 136a(a). Among other requirements, a pesticide may only be registered if "it will perform its intended function without unreasonable adverse effects on the environment; and [] when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(b)(5)(C)-(D). This standard requires assessing the "economic, social, and environmental costs and benefits of the use

---

[2] "The term 'pesticide' means (1) any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest, (2) any substance or mixture of substances intended for use as a plant regulator, defoliant, or desiccant, and (3) any nitrogen stabilizer. . . ." 7 U.S.C. § 136(u).

United States District Court
Northern District of California

1    of [the] pesticide." 7 U.S.C. § 136(bb).  "In order to register a new pesticide, a manufacturer must

2    submit an application for registration, describing how the pesticide will be used, the claims made of

3    its benefits, the ingredients, and a description of all tests and studies done and the results thereof,

4    concerning the product's health, safety, and environmental effects." *Pollinator Stewardship*

5    *Council v. U.S. E.P.A.*, 806 F.3d 520, 523 (9th Cir. 2015) (citations omitted).  Registered pesticides

6    must also undergo a registration review process, initially by the later of October 1, 2022 or 15 years

7    after registration, then subsequently every 15 years.  7 U.S.C. § 136a(g).  "[T]he 'registration

8    review' process serves as a backstop to ensure that pesticides do not remain registered once new

9    data has shown them to be harmful to humans or the environment." *Nat'l Fam. Farm Coal. v. U.S.*

10    *Env't Prot. Agency*, 966 F.3d 893, 918 (9th Cir. 2020).  For the pesticides at issue in this case, the

11    registration review process began in 2008 and 2011 but remains in progress.  AR 56; Dkt. No. 68

12    ("EPA Opp'n") at 28.  Congress has pushed back EPA's statutory deadline for completing these

13    initial registration reviews to October 1, 2026.  Consolidated Appropriations Act, 2023, Pub. L. No.

14    117-328, Div. HH, § 711, 136 Stat. 6083 (2022).

15        In FIFRA, Congress granted the EPA Administrator the authority to "exempt from the

16    requirements of this Act by regulation any pesticide which the Administrator determines either (1)

17    to be adequately regulated by another Federal agency, or (2) to be of a character which is

18    unnecessary to be subject to this Act in order to carry out the purposes of this Act."  7 U.S.C.

19    § 136w(b).  If an unregistered pesticide is exempted, the EPA Administrator may still "limit [its]

20    distribution, sale, or use" by regulations, the violation of which is an unlawful act.  7 U.S.C.

21    §§ 136a(a), 136j(a)(2)(S).

22        Pursuant to its authority under section 136w, subdivision (b), the EPA in 1988 created the

23    "Treated Article Exemption" in 40 C.F.R. § 152.25.  53 Fed. Reg. 15977 (May 4, 1988).  The

24    Administrator's exemption authority and this regulation are central to the current litigation.  In full,

25    the exemption states:

26        **§ 152.25 Exemptions for pesticides of a character not requiring FIFRA regulation.**

27        The pesticides or classes of pesticides listed in this section have been determined to be of a
      character not requiring regulation under FIFRA, and are therefore exempt from all provisions
28      of FIFRA when intended for use, and used, only in the manner specified.

3

(a) ***Treated articles or substances.*** An article or substance treated with, or containing, a pesticide to protect the article or substance itself (for example, paint treated with a pesticide to protect the paint coating, or wood products treated to protect the wood against insect or fungus infestation), if the pesticide is registered for such use.

40 C.F.R. § 152.25(a). In subsections (b) through (f), section 152.25 lists other exempted pesticides, including "Pheromones and pheromone traps," "Preservatives for biological specimens" like embalming fluids, "Foods," "Natural cedar," and a long list of "Minimum risk pesticides" like citronella, garlic, peppermint, and zinc. 40 C.F.R. § 152.25(b)-(f). Plaintiffs asserted in their petition and the EPA agreed "that the codified regulatory text and the proposed and final rule preambles do not discuss whether the exemption applies to pesticide-treated seed." AR 68.

FIFRA contains a section allowing for judicial review of EPA decisions under the statute's regulatory regime. 7 U.S.C. § 136n. Circuit courts of appeals are granted jurisdiction to hear a challenge to the validity of orders issued by the Administrator after a hearing. *Id.*, subd. (b). Federal district courts may review any other final actions of the Administrator "not committed to the discretion of the Administrator by law." *Id.*, subd. (a).

## II.    FIFRA As Applied To Neonicotinoid Treated Seeds

Plaintiffs challenge how the EPA has decided to apply this regulatory framework to seeds treated by a particular kind of pesticide called neonicotinoids. Neonicotinoids are "systemic" pesticides, which means they are, in the terms of plaintiffs' 2017 citizen petition, "pesticide delivery devices." AR 11. When applied to a seed, the active ingredient of the pesticide circulates through the systems of the resulting plant. *Id.*; AR 59 n.37. Various types of neonicotinoids have been registered under FIFRA and they can be sprayed over fields or applied directly on seeds before planting; seed treatment accounts for approximately ninety-five percent of the land affected by neonicotinoids.[3] AR 6.

Once neonicotinoids have been applied to seeds, the EPA agrees with plaintiffs that the treated seeds themselves become "pesticides" as defined by FIFRA. AR 76-77; 7 U.S.C. § 136(u).

_____

[3] Spraying neonicotinoids onto planted fields or applying it directly to the soil results in higher pesticide residues than the use of seed treatments. AR 2439.

United States District Court
Northern District of California

There is no dispute that the treated seeds are unregistered pesticides.  The central dispute here is whether the treated seeds, as unregistered pesticides, are properly exempted from FIFRA's restrictions on unregistered pesticides by the Treated Article Exemption.

Neonicotinoid treated seeds are currently subject to some regulatory requirements.  Under FIFRA's framework, neonicotinoids must be applied to seeds in a manner consistent with the EPA's parameters for the registered pesticide.  AR 87.  The requirements for the registered neonicotinoid might include printing a seed bag tag that tells the end users how to appropriately use the treated seed.  *Id.*  If a company applies the treating neonicotinoid to a type of seed not approved for that neonicotinoid in its registration, or distributes and sells the treated seed without seed bag tags required by the neonicotinoid's registration, then the pesticide is considered unregistered and its distribution and sale is subject to possible enforcement action.  AR 87-88.  At this point the treated seed is also an unexempted pesticide, because the Treated Article Exemption only applies "if the pesticide is registered for such use."  40 C.F.R. § 152.25(a); AR 87-88.

However, while FIFRA prohibits the distribution and sale of unregistered pesticides, plaintiffs assert and the EPA agrees that FIFRA does not contemplate enforcement to curtail any improper *use* of unregistered pesticides.[4]  AR 88.  A neonicotinoid may be applied to seeds within the parameters of its registration and the seed bag tag could have the instructions required by the EPA, but farmers may ignore those instructions.  If they do, there are no current legal repercussions.[5]

### III.    Impact of Neonicotinoid Treated Seeds

The petition and the briefing papers focus on three particular active ingredients: imidacloprid, thiamethoxam, and clothianidin.  *See, e.g.,* AR 17.  These pesticides were registered by the EPA in 1994, 2000, and 2003, respectively.  Dkt. No. 1 ("Compl.") ¶ 37.  The agricultural use of neonicotinoids grew slowly from 1994 to 2003, then increased exponentially from

---

[4] FIFRA prohibits the "use of any registered pesticide in a manner inconsistent with its labeling."  7 U.S.C. § 136j(a)(2)(G).  Treated seeds are unregistered pesticides.

[5] In its petition denial, the EPA stated that it has no evidence showing that labeling instructions on treating pesticides or seed bag tags are being ignored.  AR 92.

United States District Court
Northern District of California

1    approximately 500,000 pounds in 2003 to nearly 8,000,000 pounds in 2014. *Id.* As noted above,

2    these pesticides have not yet completed their first registration review process.

3         The impact these neonicotinoids have on the environment and agricultural yield is hotly

4    contested by the parties. Plaintiffs argue that neonicotinoid treated seeds come with heavy costs

5    and few benefits. They stress a finding from one study that 80-98% of the pesticidal treatment falls

6    off the seed into the surrounding environment. AR 3968. In their petition, plaintiffs cited studies

7    published in 2015 and 2016 that conclude that neonicotinoids weaken honey bee colonies,

8    contaminate nearby vegetation and aquatic ecosystems, and poison birds. AR 20-24, 31-33. The

9    petition noted the European Union prohibited neonicotinoid seed treatments for most crops and that

10   the U.S. Fish and Wildlife Service ("FWS") banned neonicotinoids in all National Wildlife Refuges.

11   AR 18-20. The FWS singled out neonicotinoid treated seeds as a factor in the listing of three species

12   on the endangered species list, one bee species and two butterfly species. AR 27. On the other side

13   of the cost-benefit equation, the petition cited a Center for Food Safety review of published scientific

14   articles that concluded neonicotinoid treated seeds offer "no net yield benefit to farmers across the

15   majority of crop-planting contexts." AR 30. The petition also cited a 2014 study by the EPA that

16   determined these treated seeds produced "limited to no benefit" for soybean growers. AR 31.[6]

17        Unsurprisingly, the intervenor defendants reach a very different conclusion.[7] Several

18   representatives of the intervenor defendants submitted comments in response to the petition. They

19   assert that seed treatment reduces the overall amount of pesticides used compared to spraying and

20   "minimize[s] off-target exposure." AR 235. Further, seed treatment increases crop yields across

21   numerous crops, including 4% and 13-20% increases for soybean and corn yields, respectively. AR

22

23        [6] Intervenor defendants, a group of agricultural industry associations, contend that the EPA
24   changed these findings in 2017 to conclude that treated seeds provided $4 to $23 in benefit per acre.
     Dkt. No. 69 ("Intervenor Defs.' Opp'n") at 13 (citing AR 2660-67). Plaintiffs acknowledge "EPA
25   amended certain findings from its original report in 2017 under the Trump Administration, to reflect
     industry comments about regional findings." Pls.' Reply at 46 n.44.

26        [7] As a regulating agency, the EPA in its petition denial emphasizes that it "quantitatively and
27   qualitatively characterizes the possible transport routes and exposures of non-target organisms" and
     "conducts thorough assessments of the seed treatment uses." AR 58-59. After pointing to its data
28   in registration and registration review documents, the agency notes that "in summary, EPA disagrees
     with the Petition claims relating to the adequacy of EPA assessments." AR 58.

United States District Court
Northern District of California

184, 257.  Citing other scientific articles, they challenge petitioner's conclusion that 80-98% of the treating pesticide falls off the seed into the surrounding environment.  AR 249.  In their briefs, intervenors point to the EPA's Final Bee Risk Assessments that seed treatment results in a "low risk from exposure" to bees.  Intervenor Defs.' Opp'n at 16 (citing AR 2439-41).  They question the validity of the assessment that most of the treatment comes of the seed, arguing instead that the active ingredient metabolizes and degrades.  *Id.* at 18.  They note that recent technological changes have the potential to significantly reduce the amount of pesticide that comes off in dust.  Dkt. No. 81 ("Intervenor Defs.' Reply") at 7 (citing AR 3987).  Intervenors also contest the conclusion that neonicotinoid treated seeds affect aquatic environments because the underlying studies do not distinguish between seed treatments and other application methods.  Intervenor Defs.' Opp'n at 23. According to intervenors, disallowing neonicotinoid treated seeds would be "severely disruptive to the agricultural community."  *Id.* at 27.

## IV.    Procedural History of the Case

Alongside commercial beekeepers and farmers, plaintiffs Center for Food Safety ("CFS") and Pesticide Action Network of North America ("PANNA") filed with the EPA on April 26, 2017 a citizen petition ("Petition"), "which urged EPA to close the regulatory loophole allowing seeds coated with systemic pesticides [] to evade the registration and labeling requirements of the Federal Insecticide, Fungicide, and Rodenticide Act."  Compl. ¶ 1; AR 2-47.  Previously, in 2016, plaintiffs filed a lawsuit to challenge application of the Treated Article Exemption to neonicotinoid treated seeds in a 2013 EPA guidance document, but the court dismissed their claims at summary judgment because the 2013 guidance was not a judicially reviewable "final agency action" under the Administrative Procedure Act.  *See Anderson v. McCarthy*, No. C 16-00068 WHA, 2016 WL 6834215, at *13 (N.D. Cal. Nov. 21, 2016).  Plaintiffs then filed the 2017 Petition, forcing the EPA to make a formal determination on the question of whether treated seeds fall under the Treated Article Exemption.  Compl. ¶¶ 99-102.

Specifically, the 2017 Petition requested the EPA "clearly communicate to the regulated community that systemic pesticidal seeds intended to kill insect pests of the plants are not included"

under the FIFRA's Treated Article Exemption. AR 5. The Petition requested the EPA either amend 40 C.F.R. § 152.25(a) "to clarify that it does not apply to seeds for planting coated with systemic pesticides, such as the neonicotinoids, that are intended to kill pests of the plant instead of pests of the seed itself" or by publishing a "final, formal, agency interpretation in the Federal Register stating that EPA interprets the exemption in 40 C.F.R. § 152.25(a) not to apply to seeds for planting coated with systemic pesticides, such as the neonicotinoids. . . ." AR 8. The Petition further requested the EPA "[a]ggressively enforce FIFRA's numerous pesticide registration and labeling requirements for each separate crop seed product that is coated with a neonicotinoid or other systemic insecticidal chemical." *Id.*

In December 2021, having not yet received a response from the EPA, plaintiffs filed an undue delay lawsuit. Compl. ¶ 104; *Center for Food Safety v. EPA*, No. 21-cv-9640 (N.D. Cal. Dec. 14, 2021). As a result, EPA agreed to respond to the Petition by September 30, 2022. Compl. ¶ 104. On September 27, 2022, the EPA denied the requests in the Petition. AR 48-103. Plaintiffs filed this lawsuit in May 2023 against the EPA and its administrator, Michael Regan (collectively, "defendant"). *See generally* Compl. In October 2023, the Court granted intervenor defendant status to a group of agricultural industry associations. Dkt. No. 45.

Plaintiffs, defendant, and intervenors have filed cross motions for summary judgment. Dkt. Nos. 61, 68 and 69.

## V.    Requested Relief and Proposed Alternatives

The Petition requested that EPA either amend or interpret the Treated Article Exemption so that it would not apply to seeds treated with a systemic pesticide intended to kill pests of the plant, not the seed. AR 8. The Petition also requested that EPA aggressively enforce registration and labeling requirements for seeds treated with systemic pesticides. *Id.*

In their complaint in this litigation, plaintiffs assert two claims for relief. First, plaintiffs contend under the Administrative Procedure Act ("APA") that the EPA's formal decision in the Petition denial to apply the Treated Article Exemption to neonicotinoid treated seeds was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Compl. ¶¶ 149-161

(quoting 5 U.S.C. § 706(2)(A)). Second, plaintiffs argue that the EPA's application of the exemption to neonicotinoid treated seeds exceeds its statutory authority under FIFRA, which limits the EPA's authority to exempt only those pesticides "of a character not requiring registration under FIFRA." Compl. ¶ 165 (quoting 7 U.S.C. § 136w(b)). Under the APA, a court shall set aside agency actions "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(C). In essence, the first claim says the Treated Article Exemption as written cannot cover neonicotinoid treated seeds, while the second claim says the EPA cannot ever exempt neonicotinoid treated seeds from FIFRA's requirements, no matter how the agency crafts its exemptions regulations.

In its Petition denial, the EPA stated its intention to issue a notice of proposed rulemaking that would (1) seek information about whether treated seeds are being used inconsistently with the labeling instructions for the registered treating pesticide; and (2) using its authority under 7 U.S.C. § 136a(a), explore issuance of a rule to regulate pesticide-treated seed to ensure it is used according to the labeling instructions for the treating pesticide and the treated seed.[8] AR 50. In their filing papers, both the EPA and intervenor defendants also maintain that plaintiffs' impact concerns are more properly considered in the ongoing registration review processes for the treating pesticides, not by creating a new registration for the treated seeds. *See* EPA Opp'n at 28-30; Intervenor Defs.' Opp'n at 7-8. Alternatively, the EPA suggests that plaintiffs could submit a petition to cancel or suspend the registration of any of the treating pesticides. EPA Opp'n at 31 n.12.

## LEGAL STANDARD

Claims under FIFRA are reviewed under the standards of the APA, 5 U.S.C. § 701 et seq. *See Ellis v. Housenger*, 252 F. Supp. 3d 800, 808 (N.D. Cal. 2017). In APA cases, "the district court acts like an appellate court, and the entire case is a question of law." *Tolowa Nation v. United States*, 380 F. Supp. 3d 959, 963 (N.D. Cal. 2019) (internal quotation marks and citation omitted). "Because this is a record review case, we may direct that summary judgment be granted to either party based upon our de novo review of the administrative record." *Pit River Tribe v. U.S. Forest Serv.*, 469

---

[8] The EPA issued its advanced notice of proposed rulemaking on October 13, 2023. 88 Fed. Reg. 70625.

F.3d 768, 778 (9th Cir. 2006) (internal quotation marks and citation omitted); *Riddell v. Unum Life Ins. Co. of Am.*, 457 F.3d 861, 864 (8th Cir. 2006) (explaining that judgment on the administrative record is "a form of summary judgment"). Under the APA, the court "shall" set aside any agency decision that the Court finds is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(A), (C).

## DISCUSSION

### I. Subject Matter Jurisdiction

"A court's [s]ubject-matter jurisdiction can never be waived or forfeited . . . and courts are obligated to consider *sua sponte* requirements that go[] to subject-matter jurisdiction." (*Kwai Fun Wong v. Beebe*, 732 F.3d 1030, 1035-36 (9th Cir. 2013) (internal quotation marks and citations omitted). Federal district courts generally have jurisdiction to hear challenges to federal agency action under federal question jurisdiction, 28 U.S.C. § 1331. *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023); *Owner-Operators Indep. Drivers Ass'n of Am., Inc. v. Skinner*, 931 F.2d 582, 585 (9th Cir. 1991). But Congress sometimes precludes such jurisdiction through "[a] special statutory review scheme," often by transferring jurisdiction directly to the circuit courts of appeal. *Id.*[9]

FIFRA provides for judicial review of the EPA's actions in 7 U.S.C. § 136n. Subsection (a) states in full:

> Except as otherwise provided in this subchapter, the refusal of the Administrator to cancel or suspend a registration or to change a classification not following a hearing and other final actions of the Administrator not committed to the discretion of the Administrator by law are judicially reviewable by the district courts of the United States.

Subsection (b) states in relevant part:

---

[9] The APA frames the same conclusion a different way: "The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction." 5 U.S.C. § 703. "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.

United States District Court
Northern District of California

> In the case of actual controversy as to the validity of any order issued by the Administrator following a public hearing, any person who will be adversely affected by such order and who had been a party to the proceedings may obtain judicial review by filing in the United States court of appeals for the circuit . . . , within 60 days after the entry of such order, a petition praying that the order be set aside in whole or in part. . . . Upon the filing of such petition the court shall have exclusive jurisdiction to affirm or set aside the order complained of in whole or in part.

This Court requested that plaintiffs and defendant EPA submit supplemental briefing on whether section 136n precludes district court jurisdiction under the circumstances of this case. Dkt. No. 79.

After reviewing the parties' briefing and relevant law, the Court determines that it has subject matter jurisdiction over plaintiffs' first claim, but not their second. The Court's jurisdiction is granted by FIFRA's jurisdictional statute, which precludes general jurisdiction under the APA.

### A.    The FIFRA statutory review scheme precludes general federal question jurisdiction under the APA.

Plaintiffs argue this Court has federal question jurisdiction under the APA. Dkt. No. 84 ("Pls.' Suppl. Br.") at 1-3. While the APA "embodies a basic presumption of judicial review," review is not available when "a relevant statute precludes it." *Dep't of Com. v. New York*, 588 U.S. 752, 771 (2019) (internal quotation marks and citations omitted). "[W]hen two jurisdictional statutes draw different routes of appeal, the well-established rule is to apply only the more specific legislation." *Ctr. for Biological Diversity v. Env't Prot. Agency*, 847 F.3d 1075, 1089 (9th Cir. 2017) (internal quotation marks and citation omitted). Plaintiffs do not directly address this preclusion argument.

The Eighth Circuit has held that "the APA does not operate separately from FIFRA, but instead as a part of FIFRA." *Defs. of Wildlife v. Adm'r, E.P.A.*, 882 F.2d 1294, 1303 (8th Cir. 1989).[10] In that case, the plaintiffs challenged a FIFRA-related decision through two other statutes that lacked a private right of action, so the plaintiffs relied on the APA and federal question jurisdiction. *Id.* at 1302. The court concluded that "[b]ecause FIFRA provides a framework for

---

[10] Legislative history for the comprehensive 1972 FIFRA revisions suggests that Congress anticipated an incorporation of APA procedures in FIFRA review: "Judicial review in district courts will be in accordance with the law generally applicable to administrative procedure." S. Rep. No. 92-838, at 28 (1972).

obtaining judicial review, the district court had no jurisdiction to consider these claims." *Id.*; *see also Rural & Migrant Ministry v. United States Env't Prot. Agency*, 565 F. Supp. 3d 578, 597 (S.D.N.Y. 2020) (holding no cause of action under the APA for challenges to agency actions under FIFRA). The Ninth Circuit has not directly addressed the interaction between the APA and FIFRA, but consistently has found that specific jurisdictional provisions override more general statutes. *See Coos County Board of County Commissioners v. Kempthorne*, 531 F.3d 792, 801 (9th Cir. 2008) (interaction of Endangered Species Act ("ESA") and APA); *Center for Biological Diversity v. EPA*, 847 F.3d at 1089 (interaction of ESA and FIFRA); *American Bird Conservancy v. F.C.C.*, 545 F.3d 1190, 1194 (9th Cir. 2008) (interaction of ESA and Communications Act).

Plaintiffs' reliance on *Northwest Environmental Advocates v. U.S. E.P.A.*, 537 F.3d 1006 (9th Cir. 2008) works against them. In that case, plaintiffs challenged an exemption the EPA granted under the Clean Water Act to certain marine discharges. *Id.* at 1010. Like here, the plaintiffs asserted two causes of action under the APA, 5 U.S.C. § 706(2)(A) and (C). *Id.* at 1014. On appeal, the Ninth Circuit acknowledged that the district court would have general federal question jurisdiction "unless some other statute divested the district court of jurisdiction." *Id.* at 1015. The court reviewed the Clean Water Act's jurisdictional provisions providing for direct circuit court review, but found that neither of the two potentially relevant categories applied. *Id.* at 1015-18. As such, the district court was not divested of jurisdiction. *Id.* at 1015. However, had the Clean Water Act's jurisdictional provisions applied, the Ninth Circuit acknowledged the district court would have lacked general federal question jurisdiction. *Id.* Whereas the Clean Water Act provides only that specific decisions must be reviewed by the courts of appeal, FIFRA's jurisdictional provisions broadly cover "any order" or "other final actions." 7 U.S.C. § 136n.

From this review, the Court concludes that FIFRA's comprehensive provision for judicial review divests this Court of general federal question jurisdiction under the APA. Plaintiffs must therefore establish jurisdiction under the terms of 7 U.S.C. § 136n, FIFRA's jurisdictional framework.

**B.      FIFRA provides jurisdiction to district courts over "other final actions" of the EPA Administrator, including this rulemaking response.**

The parties dispute whether the EPA's denial of the Petition was an "order issued by the Administrator following a public hearing" or an "other final action[] of the Administrator not committed to the discretion of the Administration by law" under the terms of FIFRA's jurisdictional statute. *See* 7 U.S.C. § 136n(a) and (b). If the Court finds the denial to be an "other final action," subsection (a) grants the district court jurisdiction. If the denial was an "order . . . following a public hearing," the statute provides exclusive review to the court of appeals.[11] 7 U.S.C. § 136n(b). Since plaintiffs filed this lawsuit after the 60-day appeal period in subsection (b) expired, considering the denial an "order . . . following a public hearing" would in essence prevent plaintiffs from seeking any judicial review of the Petition denial. The Court looks at FIFRA's text and legislative history and relevant case law to decide this question.

**1.      Textual Analysis**

FIFRA does not define the term "order." *See* 7 U.S.C. 136. In the absence of a definition, plaintiffs point to how the term "order" is specifically used in other parts of FIFRA. Pls.' Suppl. Br. at 6-7. For example, FIFRA uses the term "order" in sections regarding cancellations (7 U.S.C. § 136a-1(d)(5)), suspensions (§ 136d(c)), stop sale orders (§ 136k(a)), and recall orders (§ 136q(b)). Plaintiffs contrast this usage—which focuses on individual pesticidal product determinations—with the EPA's actions in issuing the Treated Article Exemption and denying the Petition, which they argue is more akin to rulemaking. Pls.' Suppl. Br. at 6-8. For its part, the EPA argues that the APA definition of "order" should apply. Dkt. No. 83 ("Def.'s Suppl. Br.") at 4-5. The APA defines an order as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6). An earlier draft of the 1972 FIFRA bill explicitly referred to the APA definition

---

[11] The Ninth Circuit has held that publication of notice in the Federal Register with an opportunity for comment constitutes a public hearing. *Ctr. for Biological Diversity v. Env't Prot. Agency*, 847 F.3d at 1088-89 (citing *United Farm Workers of Am., AFL-CIO v. Adm'r, E.P.A.*, 592 F.3d 1080, 1082-84 (9th Cir. 2010). The EPA filed a notice and solicited comments on the petition. AR 1. Consequently, there was a public hearing in this matter.

13

of order, although that language was subsequently removed.  *See* H.R. 10729, 92nd Cong. § 16 (as introduced in House, Sept. 16, 1971).

The APA's definition of "order" is useful because it highlights the contrast within the APA between adjudicatory functions and rulemaking functions.

> Two principal characteristics distinguish rulemaking from adjudication. First, adjudications resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals. Second, because adjudications involve concrete disputes, they have an immediate effect on specific individuals (those involved in the dispute). Rulemaking, in contrast, is prospective, and has a definitive effect on individuals only after the rule subsequently is applied.

*Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994) (citations omitted).  By the APA's definition, an "order" cannot result from rulemaking.  *See* 5 U.S.C. § 551(6).

The EPA's analysis that its Petition denial qualifies as an "order" under the APA definition is unpersuasive.  The Petition addresses the interpretation of the Treated Article Exemption, an agency regulation.  The Petition asked for a change in the rule text or the publication of an authoritative interpretation of the rule.  AR 8.  This request was "prospective, and has a definitive effect on individuals only after the rule subsequently is applied."  *See Yesler Terrace*, 37 F.3d at 448.  Even though EPA denied the Petition, the action under consideration was within the bucket of rulemaking, not adjudication.  Moreover, FIFRA's use of the term "order" aligns with the distinction between adjudication and rulemaking.  Cancellation orders, suspension orders, and stop sale orders concern the EPA's decision-making regarding specific pesticide product registrations.  In contrast, the decision about whether to exempt neonicotinoid treated seeds affects a broader category of pesticide, not a specific registration.

### 2.  Legislative History

Taken as a whole, the relevant legislative history of the 1972 FIFRA bill establishing these jurisdictional provisions does not point to a contrary result.  In reviewing this history, the Ninth Circuit concluded

> that Congress did intend to limit review of the agency's administrative decisions issued after hearing to the Circuit Courts. Congress' purposes in adopting this technique can be enumerated as follows: (1) A desire to limit the number of conflicting decisions to the

smallest possible number; (2) To obtain finality of decision as rapidly as possible. . . . [T]he main thrust of Congress was to have final decisions of the Administrator passed on to the Court of Appeals where there was an adequate administrative record for the Court of Appeals to review the propriety of the action. Such a record, of course, is developed by a "hearing." This is the rationale of the bifurcated judicial review provision enacted by Congress.

*AMVAC Chem. Corp. v. U.S. E.P.A.*, 653 F.2d 1260, 1263, 1265 (9th Cir. 1980).  But that court also noted that "Congress . . . specifically provides for review by the District Court of 'other final agency actions not committed to agency discretion by law.'"  *Id.* at 1263.[12]  It is unclear whether Congress considered the broader meaning of "public hearing"—including any action after notice and public comment—that courts do today.   The final enacted bill appears to distinguish between "public hearings" and "solicitation of views," requiring that the Administrator publish notice of "public hearings" in the Federal Register.  Pub. L. No. 92-516, § 21, 86 Stat. 996 (1972).

Further, earlier versions of the bill indicate a distinction between "orders" and "rule making" actions.  When introduced in 1971, subsection (a) of what is now section 136n incorporated the procedures of the APA and subsection (b) called for circuit court review of any order following a public hearing. H.R. 10729, 92nd Cong. § 16 (as introduced in House, Sept. 16, 1971).  Subsection (a) noted that APA procedures applied to "rules, rule making, orders, adjudication, licensing, sanctions, agency proceedings, and agency actions" as the terms were defined in the APA, with the exception for orders following a public hearing.  *Id.*   Later, when considered by the Senate, the language referring to the APA was replaced with the current language about district court review. *See* H.R. 10729, 92nd Cong. § 16 (as reported in Senate, July 19, 1972).  Reasons for the change are sparse in the legislative record.  A senate report tersely explained the new language "simplified the procedures for judicial review" and "provides for judicial review by the court of appeals in all cases where there has been an administrative hearing and by the district court in all cases where there has not been an administrative hearing."  S. Rep. No. 92-838, at 12, 28 (1972).  Nothing in the record suggests Congress intended to define "order" differently in FIFRA than in the APA.

---

[12] In the *AMVAC* case, the court of appeals determined that the district court had jurisdiction over the question of whether the agency erred in not holding a hearing.  *Id.* at 1265.

### 3. Case Law

Plaintiffs cite several cases where district courts exercised jurisdiction to review EPA actions under FIFRA, although none of them are directly on point. The most helpful is *Reckitt Benckiser Inc. v. E.P.A.*, 613 F.3d 1131, 1136 (D.C. Cir. 2010), where a company challenged EPA's interpretation of its authority under FIFRA to initiate a pesticide misbranding enforcement action without first cancelling the pesticide's current registration. The D.C. Circuit determined EPA's interpretation was not an order following a public hearing that would channel jurisdiction to the court of appeal under section 136n, subdivision (b). *Id.* at 1141. Instead, the appellate court determined the district court had jurisdiction to consider a challenge to the EPA's interpretation of its authority under the "other final action[]" language in section 136n, subdivision (a). *Id.* However, there does not appear to have been any notice and comment period that could amount to a public hearing, distinguishing *Reckitt* from this case.

Cases that might suggest the Court lacks jurisdiction are likewise distinguishable. In *Ellis v. Housenger*, 252 F. Supp. 3d at 816, the court determined it lacked jurisdiction to consider a challenge to pesticide product registrations that followed a notice and comment period, but a registration decision, similar to a license, falls more easily into the APA's definition of "order." *See* 5 U.S.C. § 551(6). The EPA also directs the Court to *Silberstein v. U.S. Securities and Exchange Commission*, 153 F. Supp. 3d 233, 237 (D.D.C. 2016), where that district court characterized a potential response to a petition for rulemaking as a "final order" that was only appealable at the circuit court. But the statutory scheme at issue there, 15 U.S.C. § 78y, specifically called for judicial review in the circuit courts of "a final order" or, separately, "a rule of the Commission." Therefore, whether the court called a response to a rulemaking petition an order or a rule, the result would have been the same: review was only allowed in the circuit court. Similarly, in *F.C.C. v. ITT World Communications, Inc.*, 466 U.S. 463, 468 (1984), the Supreme Court considered a denial of a rulemaking petition to be a final order, which was appealable exclusively in the circuit court per the statutory scheme. The district court thus lacked jurisdiction to hear a claim that the federal agency acted ultra vires, as this claim "sought to enforce the same restrictions upon agency conduct as did the petition for rulemaking." *Id.* Again, though, the statutory scheme in that case only refers to

16

"final orders" and did not present the central juxtaposition in this case: what is an order versus what is another final action.

### 4.    Conclusion

Considering the statutory text, history, and jurisprudence, the Court holds it has subject matter jurisdiction over this litigation under the "other final actions" clause of 7 U.S.C. § 136n(a). The EPA's Petition denial was not an adjudicatory order, but rather a form of interpretative rulemaking, even though no changes to the agency's rules resulted. Consequently, this action is more appropriately considered an "other final action" and the Court retains jurisdiction.

### C.    The statutory registration review process implicitly precludes jurisdiction on plaintiffs' second claim.

As a separate argument, EPA asserts that the Court lacks jurisdiction to hear plaintiffs' second claim because it is in effect "a direct attack on EPA's ongoing registration review for pesticides used to treat seeds." EPA Opp'n at 25-27; Dkt. No. 78 ("EPA Reply") at 1-2. The proper forum for plaintiffs' challenge, in the EPA's view, is an appeal of the registration review processes once they have finalized. *Id.* Since that process involves a "public hearing," the appropriate court to hear a subsequent challenge would be the court of appeals. *Id.* (citing 7 U.S.C. § 136n).

While a statute may explicitly foreclose avenues of judicial review, Congress can also preclude review "implicitly, by specifying a different method to resolve claims about agency action." *Axon*, 598 U.S. at 185. The primary question for courts is "whether the particular claims brought were of the type Congress intended to be reviewed within this statutory structure." *Id.* at 186 (internal quotation marks and citation omitted). Courts consider three factors in this inquiry, known as the *Thunder Basin* factors: "First, could precluding district court jurisdiction foreclose all meaningful judicial review of the claim? Next, is the claim wholly collateral to [the] statute's review provisions? And last, is the claim outside the agency's expertise?" *Id.* (internal quotation marks and citations omitted). Affirmative answers to these questions suggest that Congress did not intend to limit jurisdiction. *Id.* In *Axon*, the Supreme Court held that a constitutional separation-of-powers

claim against agency administrative law judges belonged in the district court because it was fundamentally distinct from claims against substantive agency decisions. *Id.* at 195-96.

Arguably, a consideration of the first *Thunder Basin* factor weighs in favor of district court jurisdiction. The EPA asserts that plaintiffs have an opportunity for "meaningful judicial review" of their ultra vires claims through the registration review process. EPA Opp'n at 26. But plaintiffs insist their challenge "has nothing to do with the outcome of EPA's registration review of the three major neonicotinoid active ingredients." Dkt. No. 74 ("Pls.' Reply") at 4. Plaintiffs note that that the registration review process cannot produce the outcome they seek: the removal of the exemption applied to neonicotinoid treated seeds. *Id.* at 7. As in *Axon*, plaintiffs argue the agency is acting beyond the limits of its authority.

The second *Thunder Basin* factor—whether the ultra vires claim here is "wholly collateral" to the registration review process—weighs against district court jurisdiction over this claim. Plaintiffs argue that neonicotinoid treated seeds are "of a character" requiring registration for several reasons. Dkt. No. 61 ("Pls.' Mot.") at 21-24; Pls.' Reply at 10-14. First, seed treatment has grown to now account for the vast majority of neonicotinoid application. Second, most of the treatment sloughs off the seed into the surrounding environment. Third, neonicotinoid treated seeds have unreasonable adverse effects on the environment. And fourth, treated seeds do not share many characteristics with the other pesticides that EPA has determined it is unnecessary to regulate. The first three arguments overlap significantly with a potential challenge to a registration review decision. These arguments are not "wholly collateral" to the registration review process.

The third factor also weighs in favor of the EPA's argument against jurisdiction. The EPA clearly exercises substantive expertise in assessing the character of neonicotinoid treated seeds.

At least two of the three *Thunder Basin* factors suggest that Congress implicitly precluded this backdoor, ultra vires challenge to registration decisions when it enacted FIFRA. The Court finds that the registration review process and subsequent opportunities for judicial appeal will address the "character" of neonicotinoid treated seeds. As such, the Court lacks subject matter jurisdiction to consider plaintiffs' second claim.

United States District Court
Northern District of California

## II.    Motion to Strike Extra-Record Evidence

Plaintiffs have submitted two declarations from Dr. Pierre Mineau attached to their briefing papers.  Dkt. Nos. 61-5 and 74-6.  The EPA argues that the first Mineau declaration is inadmissible extra-record evidence and untimely, because the Court had established a deadline for putting forward extra-record evidence before filing summary judgment motions.  EPA Opp'n at 32-34 (citing Dkt. No. 50); EPA Reply at 12-14.  The intervenor defendants filed a motion to strike the second Mineau declaration.  Dkt. No. 77.  The EPA joined this motion, agreeing that the second declaration was not admissible for any reason other than remedy.  Dkt. No. 80.

"[T]he Supreme Court has expressed a general rule that courts reviewing an agency decision are limited to the administrative record."  *Lands Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir. 2005) (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985)).  This rule has a few exceptions that are to be "narrowly construed and applied," including "if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision," or "when supplementing the record is necessary to explain technical terms or complex subject matter."  *Id.*  (internal quotation marks and citation omitted).

The "relevant factors" exception allows a court to review extra-record evidence "to develop a background against which it can evaluate the integrity of the agency's analysis," but not "to judge the wisdom of the agency's action" or "as a basis for questioning the agency's scientific analyses or conclusions."  *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014).  Given the nuance of this distinction, this exception has been deemed "the most difficult to apply."  *Id.*  Courts have disallowed expert declarations that "quibble with the data," *W. Watersheds v. U.S. Forest Serv.*, No. C 08-1460, 2012 WL 1094356, at *7 n.3 (N.D. Cal. Mar. 30, 2012), or an additional study that considers "the same subject matter as evidence already in the record," *Oceana, Inc. v. Pritzker*, No. 16CV06784LHKSVK, 2017 WL 2670733, at *8 (N.D. Cal. June 21, 2017).  *See also Pinnacle Armor, Inc. v. United States*, 923 F. Supp. 2d 1226, 1234 (E.D. Cal. 2013) ["[T]he document in question must do more than raise 'nuanced points' about a particular issue; it must point out an 'entirely new' general subject matter that the defendant agency failed to consider. [Citation.]"].

A declaration may be admitted as an explanation of technical subject matters when it "truly assists the court in understanding" such matters, not when it "merely attempts to argue the sufficiency of the record." *Alsea Valley All. v. Evans*, 143 F. Supp. 2d 1214, 1216 (D. Or. 2001). The Ninth Circuit has affirmed admission of supplemental declarations when they "condensed and explained existing material in the record." *W. Watersheds Project v. United States Forest Serv.*, 753 F. App'x 465, 467 (9th Cir. 2019).

Considering the contours of these exceptions, the Court finds that the majority of the statements in the Mineau declarations do not meet the narrow criteria described above. While the declarations point to gaps in EPA analyses, they do not raise "an 'entirely new' general subject matter that the defendant agency failed to consider." *See Pinnacle Armor*, 923 F. Supp. 2d at 1234. At multiple points, Dr. Mineau refers to additional studies considering "the same subject matter as evidence already in the record." *See Oceana, Inc. v. Pritzker*, No. 16CV06784LHKSVK, 2017 WL 2670733, at *8. And the declarations appear to "attempt[] to argue the sufficiency of the record" more than they condense or explain existing material in the record. *See Alsea Valley All.*, 143 F. Supp. 2d at 1216; *W. Watersheds Project*, 753 F. App'x at 467.

However, at least one court in this circuit has allowed parties to submit extra-record material for the purpose of determining an appropriate remedy. *See Oregon Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 143 F. Supp. 3d 1064, 1072 (D. Or. 2015). In addition to plaintiffs' Mineau declarations, the EPA has submitted its own extra-record declarations to comment on the consequences of vacatur. The Court finds this use of extra-record material would be appropriate.

The Court therefore GRANTS in part and DENIES in part the intervenor defendants' motion to strike the Mineau declarations.

### III.    Plaintiffs' Arbitrary and Capricious Claim

In their first claim, plaintiffs ask the Court to set aside the EPA's petition denial as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A); Compl. ¶ 151. Under the arbitrary and capricious standard, the Court must determine whether the agency decision "was based on a consideration of the relevant factors and whether there

has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds in Califano v. Sanders*, 430 U.S. 99 (1977).  The Supreme Court has explained that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted).  An agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

Plaintiffs make three different arguments in support of their claim that the EPA's Petition denial was arbitrary and capricious.  First, plaintiffs argue that the EPA improperly interprets the Treated Article Exemption to include neonicotinoid treated seeds.  Pls.' Mot. at 10-19; Pls.' Reply at 22-32.  Second, they contend the Petition denial should be set aside because the EPA ignored documents and evidence in its review.  Pls.' Mot. at 19-20; Pls.' Reply at 34-35.  Third, they say that the Petition denial is arbitrary and capricious because the EPA lacks important impact assessments of neonicotinoid seeds. Pls.' Mot. at 24-29; Pls.' Reply at 14-22.  For the reasons that follow, all three arguments fall short.

## A.    Interpreting the Treated Article Exemption

Federal courts have traditionally deferred to agency interpretations of their own regulations. *See Auer v. Robbins*, 519 U.S. 452 (1997); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945).  In its 2019 decision *Kisor v. Wilkie*, the Supreme Court clarified when this deference does and does not apply.  588 U.S. 558.  An agency interpretation is given deference only if the regulation is "genuinely ambiguous," a finding which first requires the reviewing court to "exhaust all the traditional tools of construction." *Id.* at 575 (internal quotation marks and citation omitted).  Even then, the agency's interpretation must be reasonable or "within the zone of ambiguity." *Id.* at 575-76.  And finally, the "character and context" of the interpretation must entitle it to "controlling

United States District Court
Northern District of California

weight." *Id.* at 576.  Namely, the interpretation must be the authoritative statement of the agency, it must implicate the agency's substantive expertise, and it must be a "fair and considered" judgment, not an after-the-fact rationalization.  *Id.* at 576-79.  If all of these requirements have been met, a court should defer to the agency's interpretation.

The critical question here is whether the language of the Treated Article Exemption—"[a]n article or substance treated with, or containing, a pesticide to protect the article or substance itself"— applies to neonicotinoid treated seeds.  40 C.F.R. § 152.25(a).  The EPA says of course it does—it is unambiguous.  Plaintiffs say of course it does not, finding it unambiguous in the opposite respect.  Following *Kisor*, utilizing all the tools of statutory interpretation, the Court finds the regulation to be ambiguous.  The EPA's definitive interpretation in the formal Petition denial is a "fair and considered" judgment and "within the zone of ambiguity" allowed by the text.  Thus, the Court defers to the agency's interpretation.

### 1.    Text

To reiterate, the Treated Article Exemption states in full:

**§ 152.25 Exemptions for pesticides of a character not requiring FIFRA regulation.**

The pesticides or classes of pesticides listed in this section have been determined to be of a character not requiring regulation under FIFRA, and are therefore exempt from all provisions of FIFRA when intended for use, and used, only in the manner specified.

(a) ***Treated articles or substances.*** An article or substance treated with, or containing, a pesticide to protect the article or substance itself (for example, paint treated with a pesticide to protect the paint coating, or wood products treated to protect the wood against insect or fungus infestation), if the pesticide is registered for such use.

40 C.F.R. § 152.25(a).

Plaintiffs present two arguments from the text.  First, that a seed is not an "article."  Second, that the phrase "to protect the article or substance itself" should be read to exclude neonicotinoid treated seeds when the treating pesticide is intended to protect the plant rather than the seed, and because much of the treating pesticide runs off the seed into the surrounding environment.

### a.     Is a seed an article?

The parties offer competing dictionary definitions of "article."  Plaintiffs' dictionaries emphasize that "article" refers to inanimate "things" or "objects," not "living organisms."  Pls.' Mot. at 13-14.  The EPA offers definitions that emphasize an article as a "commodity" or "good."  EPA Opp'n at 16-17.  The EPA also notes that the Supreme Court has applied the term "article" to genetically modified seeds in a patent case.  *Id.* at 16 (citing *Bowman v. Monsanto Co.*, 569 U.S. 278, 283-285 (2013).  At best, plaintiffs make a case that this aspect of the regulation is ambiguous, but even if so, the EPA's interpretation reasonably lies within the "zone of ambiguity."  *See Kisor*, 588 U.S. at 575-76.  The use of the word "article" can be reasonably read to include a seed.[13]

### b.     Have neonicotinoid treated seeds been treated for the protection of the article itself?

Plaintiffs next claim that the Treated Article Exemption cannot be read to exempt neonicotinoid treated seeds because the seeds have not been treated "to protect the article . . . itself."  *See* 40 C.F.R. § 152.25(a); Pls.' Mot. at 15.  Plaintiffs advance two arguments in this regard.  First, to the extent that neonicotinoid treatments are applied to protect the growing plant and not the seed, the treated seeds should not be exempted.  *Id.*  And second, since plaintiffs allege that 80-98% of the treating pesticide sloughs off into the environment, it is not reasonable to say that this treatment is for the protection of the seed itself.  *Id.*  The Court addresses these contentions in reverse order.

Plaintiffs' second argument that "to protect the article . . . itself" should exclude neonicotinoid treated seeds relies on their assertion that 80-98% of the treating pesticide comes off the seed into its surrounding environment.  Pls.' Mot. at 15.  When the vast majority of the treatment does not stay on the article, plaintiffs reason, the treatment cannot be "to protect the article . . . itself."  *Id.*  For its part, the EPA argues that the language of the exemption speaks to the intent of the pesticide treatment, not whether the treatment adheres to the article in question.  AR 81; EPA

---

[13] The EPA also argues that plaintiffs have forfeited this textual argument about the definitional boundaries of "article" by not raising it in the Petition.  EPA Opp'n at 15-16.  As the Court finds the EPA's interpretation of article to be reasonable, it need not consider whether the waiver doctrine applies.

Opp'n at 18. Plaintiffs reply that this would lead to absurd results, like the exemption of a shower curtain treated with an antimicrobial where 95% of the pesticidal treatment washed down the drain. Pls.' Reply at 28.[14]  However, as a purely textual matter, the language of the Treated Article Exemption supports the EPA's view that the regulation considers the intent of the treatment. This reading of the regulation is entirely reasonable.

The Court returns to plaintiffs' first argument, which is that the Treated Article Exemption cannot be read to apply to seeds treated with pesticides designed to protect the growing plant, not the seed. This argument presupposes that the seed and the growing plant are not the same article within the meaning of the regulation. The EPA does not explicitly argue that the seed and the growing seedling or plant need to be considered the same article. AR 81 n.85; EPA Opp'n at 17. Instead, the EPA argues that the regulation "expressly allows the form of the treated article to change and the benefit of the protections to flow through that changed form." EPA Opp'n at 17. Referring to the example of treated wood listed in the text of the regulation, the EPA argues that the treatment there is not for stacked piles of wood "but for the benefit of the wood in use." *Id.* The Petition denial also refers to the example of antimicrobial treatments of plastic products, which start as fibers or threads and then, when combined, become fabric and textile products. AR 80.

The Court does not fully agree with plaintiffs that the seed and the growing plant are two separate articles. To be sure, in considering whether the Treated Article Exemption should include a "downstream" form of the product, *see* AR 80, the Court finds a meaningful distinction between the inanimate examples provided the EPA and the case of a seed that transforms into a plant. In the EPA's examples, numerous discrete treated articles combine to form a product, like a fabric or a wooden wall. The articles have not transformed into something new; they have taken on a new use by virtue of a collective form. The transformation from seed to plant, by contrast, involves a small article flourishing into a complex living organism. But if a seed is not the same article as the plant,

---

[14] The EPA does not directly dispute plaintiffs' assertions that so much treatment falls off the seed, but the intervenor defendants do. Intervenor Defs. Opp'n at 17-18. They attack the source article of plaintiffs' claim, asserting the source "ignores that the active ingredient metabolizes and degrades both inside and outside the plant." *Id.* Plaintiffs respond by pointing to EPA data that shows one of the primary neonicotinoid ingredients, clothianidin, "dissipate[s] very slowly under terrestrial field conditions." Pls.' Reply at 11-12 (citing AR 1702-03).

1    plaintiffs have not clearly articulated at what point a seed becomes a different article—something

2    other than a seed.  In its life cycle, a seed becomes a seedling and then a plant, but the Court cannot

3    say with certainty when those transformations occur.  And when these lines are blurred, it is

4    reasonable to question whether a seed is truly a separate article from the plant it becomes.

5         For this reason, the Court concludes from the text that whether the language "to protect the

6    article . . . itself" excludes seeds treated with neonicotinoids that protect the growing plant is

7    ambiguous.[15]

8

9              **2.    Structure**

10        To argue that the structure of the regulation supports their position, plaintiffs draw

11   comparisons between the nature of neonicotinoid treated seeds and the other exemptions in 40

12   C.F.R. § 152.25.  Pls.' Mot. at 15-16.  The other subsections promulgated under the EPA's

13   exemption authority cover "Pheromones and pheromone traps," "Preservatives for biological

14   specimens" like embalming fluids, "Foods," "Natural cedar," and a long list of "Minimum risk

15   pesticides" like citronella, garlic, peppermint, and zinc.  40 C.F.R. § 152.25(b)-(f).  These other

16   exempted pesticides, plaintiffs argue, "are far more innocuous than neonicotinoid-treated seeds" or

17   used in more limited quantities than treated seeds planted across 150 million acres.  Pls.' Reply at

18   32 (emphasis removed).  The EPA acknowledges that the Treated Article Exemption is different

19   from the other exemptions in the section as it is the only exception that requires the EPA to make a

20   registration determination that the use (of the treating pesticide) will not have an unreasonable

21   adverse effect on the environment.  EPA Reply at 11.  As such, the exemption "is consistent with

22

23   ───────────────

24        [15] Even if the Court agreed with plaintiffs that the language excludes seeds treated to protect
     the growing plant, that conclusion would not neatly settle the matter.  The parties dispute whether
25   the treating pesticides are registered for the protection of the seed, seedling, or the plant.  In the
     Petition, plaintiffs claim that thirteen of fifteen listed treating pesticides "lack a clear label claim
26   that the neonicotinoid ingredient protects the planted seed itself; the labels generally state that the
     neonicotinoids are to kill 'chewing and sucking insect pests' of the growing *plants*, not of the seeds."
27   AR 13-14; *see also* Pls.' Reply at 25-27.  EPA reviewed the labels and concluded they "permissibly
     refer to the seed and the growing seedling."  AR 81.  The intervenor defendants also argue that the
28   seed treatments "offer significant protections to the seed," primarily citing record comments from
     agricultural industry leaders and the EPA.  Intervenor Defs.' Opp'n at 10-11.

United States District Court
Northern District of California

the statutory structure because the registration requirement, along with other features of the exemption, support the finding that further regulation is unnecessary, and an exemption is warranted." *Id.*

The Court agrees with plaintiffs that the other categories of exemptions in the regulation are, for the most part, seemingly more innocuous than neonicotinoid treated seeds in widespread agricultural use. But the EPA persuasively counters that neonicotinoid treated seeds are exempted not because they are innocuous, but because registering them would be redundant when the text of the regulation requires the treating pesticide to be already "registered for such use." *See* 40 C.F.R. § 152.25(a).

Plaintiffs next compare the EPA's exemption of neonicotinoid seeds with the EPA's treatment of plant incorporated protectants (PIPs). Pls.' Mot. at 18-19; Pls.' Reply at 33-34. A PIP is defined as "a pesticidal substance that is intended to be produced and used in a living plant, or in the produce thereof, and the genetic material necessary for production of such a pesticidal substance." 40 C.F.R. § 174.3. The ability of PIPs to "spread and increase in quantity in the environment distinguish them from traditional chemical pesticides" and they are subject to special regulations. 40 C.F.R. § 174.1. The EPA requires registration of the PIP, but the plant is exempt from registration under the authority granted to the EPA to exempt pesticides regulated by a different federal agency. EPA Opp'n at 23; *see* 7 U.S.C. § 136w. According to plaintiffs, the EPA nonetheless regulates certain aspects of PIP plant usage but it does not do the same for neonicotinoid treated seeds, despite notable similarities between the two. Pls.' Reply at 34. At most, plaintiffs' comparison suggests that some additional regulation may be appropriate for neonicotinoid treated seeds, but does not lend support to the claim that the treated seeds need to be registered. In each case, there is only one layer of registration, for either the PIP or the treating pesticide.

### 3.  History

The EPA established the Treated Article Exemption in 40 C.F.R. § 152.25 in 1988. 53 Fed. Reg. 15977. Prior to this rule, the government considered some pesticide-treated articles not to be "pesticides," and therefore not subject to registration under FIFRA. AR 68-69; *see also First Nat.*

*Bank in Albuquerque v. United States*, 552 F.2d 370, 374 (10th Cir. 1977) (commenting that treated seed was not subject to regulation under FIFRA).   In 1984, the EPA proposed a rule that declared treated articles not to be pesticides because they did not have a "pesticidal effect."  AR 69-70; 49 Fed. Reg. 37937.  Between 1984 and 1988, however, the EPA changed course and determined that some treated articles may be pesticides but should be exempt from regulation, thus leading to the creation of the Treated Article Exemption in section 152.25(a).   AR 70.

In 2000, the EPA addressed treated seeds for the first time, publishing a draft discussion paper "on how pesticide seed treatments are currently regulated in both Canada and the United States . . . ."  65 Fed. Reg. 52752.  The paper was finalized in 2003.  AR 2793.  The document reiterated the position that treated seeds are themselves pesticides.  AR 2796.  The document described the EPA's position that "the risks of treated seeds . . . could adequately be regulated by means of registration of the treating pesticide."  AR 2797.  The paper further elaborated, "The term 'for the protection of the [seed] itself' means that the pesticidal protection imparted to the treated seed does not extend beyond the seed itself to offer pesticidal benefits or value attributable to the treated seed."  AR 2797.

Plaintiffs argue this early interpretation excluded pesticides where the protection "extends beyond the seed to the seedling and then larger plant."  Pls.' Reply at 30.  The EPA counters that this language distinguished between pesticidal protection for the seed (and what it becomes) with other uses, for example to address mosquitos in an effort to protect health.  AR 83-84; EPA Opp'n at 20.  The EPA points to two other agency interpretative documents from 2000 and 2015 that explain that products making public health claims do not qualify for the Treated Article Exemption.  EPA Opp'n at 20-21 (citing AR 2754-63 and AR 2778).   In other words, EPA claims it has consistently interpreted "to protect the article . . . itself" to distinguish products that are treated to protect the product from those treated for a fundamentally different purpose like protection of the product's user.  The Court finds the EPA's explanation reasonable.

United States District Court
Northern District of California

#### 4.       Purpose

Citing a Senate Report, plaintiffs argue the legislative purpose behind FIFRA is to "protect man and his environment."  Pls.' Mot. 16 (quoting S. Rep. No. 92-838 (1972), *as reprinted in* 1972 U.S.C.C.A.N. 3993, 3993).  Considering this purpose, plaintiffs contend that exempting a widely used and harmful pesticide through the Treated Article Exemption produces absurd results.  *Id.* at 17.  The EPA points out that the same Senate Report notes that pesticides are "essential to man's food supply both as to quality and quantity."  EPA Opp'n at 22 (quoting S. Rep. No. 92-838 (1972), *as reprinted in* 1972 U.S.C.C.A.N. 3993, 3995).  The report later concludes, "Pesticides therefore have important environmental effects, both beneficial and deleterious.  Their wise control based on a careful balancing of benefit versus risk to determine what is best for man is essential."  S. Rep. No. 92-838 (1972), *as reprinted in* 1972 U.S.C.C.A.N. 3993, 3996.  There can be no doubt that the 1972 FIFRA amendments were meant to expand its regulatory scope and came in response to "mounting public concern about the safety of pesticides and their effect on the environment."  *See Ruckelshaus*, 467 U.S. at 991.  The overall regulatory scheme, however, remains one that attempts to balance benefits and harms.  *See* 7 U.S.C. 136(bb) (taking into account benefits and costs when defining "unreasonable adverse effects on the environment").  The exemption of certain types of pesticides under such a scheme is not unthinkable.

Neither side speaks at length as to the purpose of the Treated Article Exemption itself.  Plaintiffs, without citation, write that "it was adopted to reduce the burden of having to register pesticides that are 'not of a character' requiring registration, avoiding unnecessary registrations."  Pls.' Mot. at 17.  In its petition denial and briefs, the EPA explains *how* the regulatory exemption came to be, but not *why*.  The preambles to the EPA's proposed rule in 1984 and adopted rule in 1988 do not provide specific language about why the EPA exercises its exemption authority.  *See* 49 Fed. Reg. 37916-18; 53 Fed. Reg. 15954-55.

**5.    Concluding the *Kisor* Inquiry**

Utilizing the tools of statutory interpretation, the Court finds the answer to the question—does the Treated Article Exemption apply to neonicotinoid treated seeds?—is "maybe, maybe not." Given this ambiguity, the Court proceeds to the final phase of the *Kisor* inquiry.  The Court determines that EPA's interpretation is reasonable and "within the zone of ambiguity."  *See Kisor*, 588 U.S. at 575-76.  And there is no doubt that the EPA's decision was authoritative and implicated its substantive expertise.  *See id.* at 577-78.  Finally, nothing in the record suggests that the EPA's decision was not a "fair and considered" judgment.  *See id.* at 579.  It has been the consistent, if not fully articulated, position of the agency for two decades and did not create "unfair surprise" or impose "retroactive liability" on longstanding conduct.  *See id.*  Since the EPA's decision here falls within the *Kisor* parameters, it must be accorded deference by this Court.

The EPA's interpretation of its own regulation in the Petition denial is therefore not arbitrary and capricious.

**B.    Failing to Consider Relevant Evidence**

Plaintiffs argue alternatively that the EPA's petition denial was arbitrary and capricious because the agency ignored relevant documents in the record.  Pls.' Mot. at 19; Pls.' Reply at 34-35.  The EPA counters that it directly or indirectly considered the principal documents cited by plaintiffs, then reverts to the argument that these documents are more appropriately considered in the registration review process.  EPA Opp'n at 24; EPA Reply at 6.

An agency "must examine the relevant data" and its decision is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem."  *State Farm*, 463 U.S. at 43; *see also E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 984 (9th Cir. 2020) (holding an asylum rule invalid when did not consider the special protection granted to unaccompanied minors in statute, "an important aspect of the problem").  In evaluating these claims, the Court reviews the "full administrative record," *Overton Park*, 401 U.S. at 420, which in this case includes documents included in plaintiffs' granted motion to complete the record.  Dkt. No. 57.

United States District Court
Northern District of California

In the briefing, plaintiffs cite to multiple submitted comments, academic articles, and other record materials that they assert EPA did not consider in its Petition denial. Pls.' Mot. at 19 n.30-31. The Court has reviewed the record materials cited by the plaintiffs and finds that they raise the same areas of concern as the Petition, with most of these materials highlighting risks to pollinators (*see, e.g.*, AR 148, AR 296, AR 308-09, AR 4270-4352, AR 4497, AR 4578-4609) or aquatic contamination (*see, e.g.*, AR 167, AR 2861-68, AR 4476-77, AR 4497). The EPA's Petition denial addresses aquatic contamination (AR 60-61) and honey bee health (AR 64-65). While the plaintiffs may not be satisfied with the EPA's response, the agency has not "entirely failed to consider an important aspect of the problem." *See State Farm*, 463 U.S. at 43.

Plaintiffs' also point to EPA's admission that it did not examine the thirty-six original exhibits that plaintiffs submitted with the Petition in 2017. Pls.' Mot. at 19; Dkt. No. 53-1, Ex. 13; Dkt. No. 54 at 10. Plaintiff CFS asserted that it hand-delivered hard copies of these exhibits to the EPA, but the EPA found no trace of these documents in its files. Dkt. No. 57. This matter was briefed and discussed by the Court on plaintiffs' earlier motion to complete the administrative record. *See id.* The Court could not resolve the factual issue of what happened to these exhibits after they were hand-delivered to the EPA, but determined they should be deemed "indirectly considered" by the agency and part of the administrative record. *Id.* Like the other record documents noted above, these "missing exhibits"—primarily scientific journal articles and reports—discuss the effects of neonicotinoid treated seeds on the surrounding environment, with the focus again on aquatic contamination and pollinator health.

While an agency "must examine the relevant data," *see State Farm*, 463 U.S. at 43, the Court agrees with the EPA that this data is more relevant to the ongoing registration review process, not the question of whether the Treated Article Exemption should be read to include or exclude neonicotinoid treated seeds. For this reason, the Court does not find the EPA's Petition denial arbitrary and capricious on these grounds.[16]

---

[16] Even if the Court held the EPA acted arbitrarily and capriciously by failing to consider this evidence, the proper remedy would be to remand the matter to the EPA for consideration of the material in the context of its Petition denial. The Court believes the EPA's resources would be better spent considering this material in the context of the ongoing registration review.

However, there can be no dispute that these materials are now squarely before the agency. The Court expects that the EPA will incorporate the findings of these reports and studies into its ultimate conclusions in the registration review process for neonicotinoids. If the agency fails to do so, plaintiffs may challenge whether the re-registration is supported by "substantial evidence." *See* 7 U.S.C. § 136n(b).

### C.       Lacking Impact Assessments

Plaintiffs likewise point to several areas of potential neonicotinoid impact where the EPA lacks data. Pls.' Mot. at 24-29; Pls.' Reply at 14-21. A gap in an agency's analysis may lead to an arbitrary and capricious decision. *See Center for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020) (holding an environmental impact statement arbitrary and capricious under the APA because the analysis lacked a key economic factor). Here, plaintiffs assert that the EPA lacks critical information necessary to assess the impact of neonicotinoid seeds in several ways. First, plaintiffs point to the EPA's admission that it does not assess the risk of pesticidal seed dust on non-target organisms like honey bees, having failed to develop a quantitative risk assessment. Pls.' Mot. at 26 (citing AR 1835 n.12 and AR 2481); Pls.' Reply at 16-17 (citing AR 59-60). Second, plaintiffs highlight how the EPA has stated it "lacks information to understand the relative importance of" other routes of exposure for pollinators, including surface water and contaminated soil. Pls.' Reply at 18 (citing AR 2453 and AR 2478). Third, plaintiffs disagree with the EPA's conclusion that it adequately assesses neonicotinoid contamination from surface water runoff from fields to nearby waterways. Pls.' Reply at 19-20.

In support of their argument that these data gaps led to an arbitrary and capricious decision, plaintiffs cite *Natural Resources Defense Council v. U.S. Environmental Protection Agency*, where the Ninth Circuit vacated an interim registration for glyphosate, the active ingredient in the weedkiller Roundup. 38 F.4th 34 (9th Cir. 2022). There, the EPA had stated in the record that it could not reach a firm conclusion on whether glyphosate increased cancer risk, but then decided the pesticide was "not likely to be carcinogenic to humans." *Id.* at 45-47. Noting that the agency must be "coherent and internally consistent," the court vacated the agency's conclusions and remanded

the matter to the agency. *Id.* at 46, 52.  Similarly, in *Pollinator Stewardship Council v. U.S. E.P.A.*, the circuit court vacated and remanded an unconditional registration of the pesticide sulfoxaflor. 806 F.3d at 532-33.  There again, the agency had been inconsistent.  It first conditionally registered the pesticide so that it could receive more data, but then granted an unconditional registration less than seven months later, even though the requested studies had not been submitted.  *Id.* at 527.  The court concluded:

> The EPA's basis for unconditionally registering sulfoxaflor in the absence of sufficient data documenting the risk to bees does not hold up under its own rationale. Without sufficient data, the EPA has no real idea whether sulfoxaflor will cause unreasonable adverse effects on bees, as prohibited by FIFRA. Accordingly, the EPA's decision to register sulfoxaflor was not supported by substantial evidence.

*Id.* at 532.

The Court finds the present case distinguishable from the two cases above.  *NRDC* and *Pollinator Stewardship Council* differ from this case because they involve challenges to registration decisions, a separate question than what is before the Court.  In plaintiffs' first claim, the Court has been asked to determine whether the EPA's decision to apply the Treated Article Exemption to neonicotinoid treated seeds is arbitrary and capricious, not whether the underlying registrations of the treating neonicotinoid pesticides is supported by substantial evidence.  Plaintiffs' arguments that the EPA lacks important data has little to do with the language and application of the Treated Article Exemption.  Plaintiffs' only bridge between this argument and the regulation text is to argue that the EPA cannot determine whether treated seeds "have been determined to be of a character not requiring regulation under FIFRA," as required by the introductory text of the regulation.  40 C.F.R. § 152.25.  But that introductory language mirrors the scope of the EPA's delegated authority under FIFRA, so this argument begins to bleed into plaintiffs' second claim.  *See* 7 U.S.C. § 136w(b).  The Court has already determined that it lacks jurisdiction to consider that.  To the extent that plaintiffs' arbitrary and capricious argument here relies on conclusions that would be contested in the registration review process, the Court declines to rule for plaintiffs on those grounds.

United States District Court
Northern District of California

### D.    Summary of Plaintiff's Arbitrary and Capricious Claim

In short, the Court is not persuaded by any of plaintiffs' three arguments.  The EPA's interpretation of its own regulation is reasonable and owed deference.  The EPA's Petition denial did not fail to consider relevant evidence.  Lastly, to the extent that the EPA lacks certain data, plaintiffs must challenge these gaps in an alternate proceeding.  The EPA's Petition denial was not arbitrary and capricious.  The Court therefore GRANTS EPA's request for summary judgment on plaintiffs' first claim.

## IV.    Motion to Seal Certain Portions of the Administrative Record

When plaintiffs manually filed with the Court the portions of the administrative record cited to by the parties, they requested that certain copyrighted materials be filed under seal.  Dkt. No. 86.  Neither the EPA nor intervenor defendants opposed the motion to seal.  *See* Dkt. No. 87 (statement of non-opposition by intervenor defendants).  Citing no definitive law on the question, plaintiffs sought to seal the material "in an abundance of caution."  *Id.*  While the Court appreciates plaintiffs' caution, the Court does not share these concerns about violations of copyright.  The material was manually filed with the Court and, while publicly available to anyone who wishes to review the material in the courthouse, cannot be accessed electronically via the online PACER system.  There is no serious threat to the intellectual property of the copyright holders.  The Court DENIES the motion to seal.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS summary judgment for defendant on plaintiffs' first claim that the EPA's Petition denial was arbitrary and capricious.  The Court DISMISSES for lack of subject matter jurisdiction the plaintiffs' second claim that the EPA is acting beyond its statutory authority.  Of lesser import, the Court GRANTS intervenor defendants' motion to strike the second Mineau declaration and DENIES plaintiffs' motion to seal portions of the administrative record.

The Court recognizes that its decision delays final resolution of the longstanding fight over the use of neonicotinoids on this country's farmland.  The three primary neonicotinoid active ingredients were initially registered in 1994, 2000, and 2003, before the use of neonicotinoids increased exponentially and their impact studied in greater detail.  Compl. ¶ 37.  While the registration review process began in 2008 and 2011, it remains in progress and currently is not due until 2026.  AR 56; EPA Opp'n at 28; 136 Stat. 6083 (2022).  For those convinced the harm of neonicotinoid treated seeds outweighs their benefits, that is indeed a long time to wait, especially since it is now two years past Congress' original due date for registration review.  *See* 7 U.S.C. § 136a(g).  The Court shares frustration at the protracted pace of the EPA's registration review.[17] But while administrative processes can move at a "glacial pace," "impatience [with the process] does not provide a ground to ignore Congress' carefully crafted system of judicial review."  *See American Bird Conservancy v. F.C.C.*, 545 F.3d at 1195 (internal quotation marks omitted).  Any judicial decisions about the unreasonable adverse effects of neonicotinoids must come in a later forum.

As EPA itself suggested, plaintiffs have two options to keep this issue before the courts. They can either wait to challenge the results of the registration review process, or they can use emerging science to immediately question the cost-benefit equation of neonicotinoids via a petition to cancel or suspend their registration, as CFS previously has done.  *See Ellis v. Housenger*, 252 F. Supp. 3d at 805.

**IT IS SO ORDERED**.

Dated: November 20, 2024

SUSAN ILLSTON
United States District Judge

---

[17] At the summary judgment hearing, counsel for EPA admitted the agency was statutorily required to finish the registration review process by 2026, but he stated that he did not know if the agency would meet that deadline.